# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Colin M. Simons, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) currently assigned to the Burlington, Vermont Resident Agency of the Albany, New York Division. I have been a Special Agent for over 15 years. I am responsible for working cases involving a variety of criminal violations, to include violent crimes and gangs. I have also been the affiant to numerous federal complaints and search warrants pertaining to violent crime and drugs. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID "cano.manuel.52" (the "Facebook account") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

3. The facts in this affidavit come from my personal observations and knowledge, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. Namely, information in this affidavit comes from Vermont State Police ("VSP") Detective Sean Reilly and others. This affidavit is intended to show merely that there is

probable cause to support the instant application for a search warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that the Facebook account, described in Attachment A, contains evidence of violations of 21 U.S.C. §§ 841(a), distribution of cocaine base, as described in Attachment B.

## BACKGROUND OF INVESTIGATION

5. On April 10, 2019, I applied for and was granted a warrant to search within 94 Chaffee Lane, Putney, VT, specifically, the residence of Daniel DeThomas. The affidavit in support of the application for that search warrant, which is attached as Exhibit 1 and incorporated herein, details two controlled purchases of cocaine base from Daniel DeThomas. In particular, the affidavit describes how an informant contacted Daniel DeThomas via his Facebook account to arrange each of the two of the controlled purchases. To arrange the second controlled purchase, the informant additionally contacted Daniel DeThomas by placing a "call" to his Facebook account.

6. The search warrant was executed on April 11, 2019. A photograph of DeThomas with known drug distributors was located during the search. No controlled substances or other evidence related to drug distribution was located.

7. It should be noted that on April 25, 2019, a federal grand jury sitting in Burlington, Vermont returned an indictment charging Daniel DeThomas with two counts of distribution of cocaine base. These two counts relate to the same controlled purchases detailed in the aforementioned application for a search warrant.

## **PROBABLE CAUSE**

8. As noted above, an informant contacted Daniel DeThomas via his Facebook account to arrange each of the two of the controlled purchases of cocaine base. This account is located at https://www.facebook.com/cano.manuel.52, and bears the user name "Cano Manuel." Daniel DeThomas's middle name is "Manuel." He also utilizes the alias "Cano," which is tattooed on his upper arm.

9. DeThomas's Facebook account can be accessed and viewed by the public. The public can see photos posted to the accounts, including photos posted to the "profile" of the Facebook account. I have viewed the "profile" photo on the Facebook account, as well as other publically accessible photographs on the account, and I recognize the person depicted therein to be Daniel DeThomas. I am able to identify DeThomas as the individual in the photographs because I am familiar with his appearance from my personal observations of him following his arrest.

10. I have learned that on April 19, 2019, the United States Attorney's Office sent a preservation request to Facebook, pursuant to 18 U.S.C. § 2703(f), requesting preservation of all stored communications, records, and other evidence regarding the Facebook account described in Attachment A. The preservation request will remain in effect until July 18, 2019.

## **TRAINING AND EXPERIENCE**

11. Based on my training and experience, I know the following about Facebook:
   a. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts

to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

c. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

d. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create

"lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

e. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

g. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

h. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

i. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

j. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

m. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

n. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

o. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records

of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

p. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-

location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

12. Based on my knowledge and experience, including my direct participation in investigations into the distribution of controlled substances, such as cocaine base, I also know the following:

   a. Distribution of controlled substances can be lucrative, and individuals who engage in such conduct are capable of amassing tens of thousands of dollars or more in a short period of time and often physically retain such currency for long periods of time, even after their distribution activity has ceased;

   b. It is common for sellers of controlled substances to put bank accounts, assets, and cell phones in the names of associates or fictitious names to avoid detection and to conceal illegitimate income;

   c. Controlled substance traffickers maintain and access books, records, receipts, bills of sale, notes, ledgers, computer software, airline tickets, money orders, and other documents relating to the transportation, acquisition, and distribution of controlled substances and proceeds, and much of this information is commonly

stored electronically in cellular telephones and other electronic devices capable of storing electronic data;

d. Persons engaged in criminal activity often spend the proceeds of their criminal activity and maintain or access records of their expenditures on their cellular telephones long after their criminal activity has ceased. They also maintain electronic records reflecting communication with their criminal associates. Specifically, these records may include the following:

   i. Records of income and expenses, such as profit and loss statements and income and expense journals that reflect the expenditure of the proceeds of criminal activity;

   ii. Evidence of the expenditure of the proceeds of criminal activity or purchase of assets with the proceeds of criminal activity, such as invoices, receipts, rental statements, lease statements, travel records, earnest money agreements, escrow statements, and real estate deeds;

   iii. Records of the accumulation of assets acquired with the proceeds of criminal activity, such as ledgers, balance sheets and financial statements, reflecting both assets and liabilities;

   iv. Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursement of the proceeds of criminal activity;

   v. Letters and other documents reflecting communications between partners or associates, such as address and phone books reflecting the names and addresses of partners or associates, phone billing records reflecting

telephone activity, contracts and other agreements reflecting associates between individuals relative to business ventures, and cashier's checks, money orders, and wire transfers that are evidence of transactions involving the proceeds of criminal activity; and

vi. Drug traffickers frequently take or cause to be taken, photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs electronically in their cellular telephones. I know, based on my training and experience, that federal courts have recognized that unexplained wealth is probative evidence of crimes including trafficking in controlled substances.

## **CONCLUSION**

13. Based on the forgoing, I submit there is probable cause to search the Facebook account, described in Attachment A, for the evidence delineated in Attachment B.

Colin M. Simons
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on
this 23 day of May, 2019,

The Honorable John M. Conroy
United States Magistrate Judge
District of Vermont